# IN THE SUPREME COURT OF TEXAS

════════════
No. 14-0776
════════════

Mike Morath, Commissioner of Education, in His Official Capacity; Glenn Hegar, Texas Comptroller of Public Accounts, in His Official Capacity; the Texas State Board of Education; and the Texas Education Agency, Appellants,

v.

The Texas Taxpayer and Student Fairness Coalition, et al.; Calhoun County ISD, et al.; Edgewood ISD, et al,; Fort Bend ISD, et al.; Texas Charter School Association, et al.; and Joyce Coleman, et al., Appellees

═══════════════════════════════════════════════
On Direct Appeal from the
200th District Court of Travis County, Texas
═══════════════════════════════════════════════

Justice Guzman, joined by Justice Lehrmann, concurring.

*"It is easier to build strong children than to repair broken men."*

—Frederick Douglass

A strong public education system is fundamental to building strong children. Regrettably, this lawsuit—the most recent salvo in a long-waged battle over public-school funding—signals widespread dissatisfaction with the current system for financing public education in Texas. The majority of school districts—some property-rich, some property-poor—are joined by various individuals, organizations, charter schools, students, and parents in challenging the school-finance system's constitutionality. The suit marries novel arguments based on new standards of "qualitative

efficiency" and accountability with more familiar ones, including allegations that the system imposes an unconstitutional property tax and is constitutionally inadequate, unsuitable, and inefficient.[1] Although disparate in their grievances, the parties are united in the firm conviction that the system is broken. Today, the Court holds Texas's school-finance system passes the threshold of constitutionality. But this is not an endorsement of the system; to the contrary, the Court calls for "transformational, top-to-bottom reforms."[2] I fully join the Court's opinion and write separately to further emphasize that there is much more work to be done, particularly with respect to the population that represents the majority of the student base—economically disadvantaged students.[3]

## I

Our state constitution is a marvel—the intentional design of the people of Texas—but its very length and detail is a testament to the core belief that our state government, including the Legislature, must be guided and limited in the exercise of its power and discretion. The Legislature may devise and adopt highly complex laws and systems, but its enactments can and must be measured against the requirements of the charter that established its authority to govern and defines its powers and duties. In the checks and balances of our political system, the Legislature's powers are not unfettered. Those aggrieved by legislative action are not entirely without recourse and may, in a proper case, seek judicial review. While the Legislature has the duty and privilege to balance the

---

[1] *See* TEX. CONST. art. VII, § 1; *id.* art.VIII, § 1-e.

[2] *Ante* at 2.

[3] Economically disadvantaged students are those eligible to participate in the national free or reduced-price lunch program. *See* TEX. EDUC. CODE § 5.001(4). For a household with four members, the qualifying annual income is $44,863 or less for 2015–2016 and $44,123 for 2014–2015. 80 Fed. Reg. 17,026, 17,027 (March 31, 2015); 79 Fed. Reg. 12,466, 12,467 (March 5, 2014).

myriad policy choices inherent in adopting and financing an educational system that serves the diverse citizenry of this vast state, this Court is charged with determining whether the sum of those choices passes constitutional muster.

The power of the courts is not unbounded, however. We can review, but not rewrite, the Legislature's enactments; we can only grade pass or fail, yes or no. As the Court explains, here and in our prior cases, article VII, section 1 of the Texas Constitution affords the Legislature great discretion.[4] "The public education system need not operate perfectly; it is adequate if districts are reasonably able to provide their students the access and opportunity the district court described."[5] Because our review is and must be "very deferential"[6] to the Legislature, I agree the Court is obliged to conclude the system passes muster under article VII, section 1 of the Texas Constitution. The standard that governs our review is not whether the state educational and school-finance system is ideal; the constitution merely requires the system to be good enough.

Good enough now, however, does not mean that the system is *good* or that it will continue to be *enough*. Shortfalls in both resources and performance persist in innumerable respects, and a perilously large number of students is in danger of falling further behind. In the last fifteen years, the number of economically disadvantaged students served by Texas schools has risen significantly

---

[4] *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 784 (Tex. 2005).

[5] *Id.* at 787.

[6] *Ante* at 25.

and continues to outpace increases in the overall student population.[7]  Statistics show these students—close to 60% of the student populace[8]—have made performance gains but still underperform academically in comparison to their more affluent peers.  The *majority* of Texas school children are presently categorized as economically disadvantaged, and that majority is likely to grow.  Enrollment data shows higher concentrations of economically disadvantaged students in lower grades and an oncoming population bulge among younger children.[9]

Low-income students come to school without the advantages enjoyed by many of their classmates, often without the same life experiences and frame of reference as more affluent students.  Poor children may never have been more than a few blocks away from home, never had access to computers or visited a museum.  Their families, often lacking the means to provide academic support and stability, are struggling to provide their children with reliable nutrition, health care, housing, and transportation and, as a result, may move often.  Once in school, low-income children are frequently without the opportunity, means, or transportation for extracurricular activities, after-school tutoring, summer school, or other enrichment activities.  As the Court concedes, there are conflicting studies on whether family characteristics like socioeconomic status or parental education matter more to

---

[7] DIVISION OF RESEARCH & ANALYSIS, TEX. EDUC. AGENCY, ENROLLMENT IN TEXAS PUBLIC SCHOOLS 2014-15 (2016) (Doc. No. GE16 601 09), available as a PDF file through links on the agency's *Enrollment Trends* webpage, at http://tea.texas.gov/acctres/enroll_index.html.

[8] *Id*. at ix–x.

[9] *Id*. at 10, 20; DIVISION OF RESEARCH & ANALYSIS, TEXAS EDUC. AGENCY, ENROLLMENT IN TEXAS PUBLIC SCHOOLS 2013-14 at ix, 15, 20 (2014) (Doc. No. GE15 601 03), available as a PDF file at http://tea.texas.gov/acctres/enroll_index.html; *see also* Steve Suitts, *A New Majority Research Bulletin: Low Income Students Now a Majority in the Nation's Public Schools*, SOUTHERN EDUCATION FOUNDATION (2015), available as a PDF file at http://www.southerneducation.org/Our-Strategies/Research-and-Publications/New-Majority-Diverse-Majority-Report-Series/A-New-Majority-2015-Update-Low-Income-Students-Now.

student success than expenditures.[10] The mandate to the Legislature, however, comes not from those studies or from the courts. The mandate comes from the Constitution, from framers who presumably anticipated the need to educate children who would not otherwise be able to participate meaningfully in the State's affairs.

To capitalize on the progress that has been achieved to date and to guard against fallow, the Legislature must continue to be strategic and flexible in its approach to supporting economically disadvantaged students. The process will take time, ingenuity, and refinement as more information becomes available, but the economic future of this great state lies in the hands of our children, and educating them must be our first priority. While perfection is neither attainable nor constitutionally required, our Legislature can and should continue to strive for a better system for *all* Texas students.

## II

As the Court observes, the Legislature has implemented a variety of methods to address the systemic needs of economically disadvantaged students. The Legislature has provided an additional per-student allotment for economically disadvantaged students, computed by multiplying these students' average daily attendance by a factor of .2. Lately, legislative solutions have centered on controversial new testing and reporting requirements. Charter schools, a once-popular suggestion for innovation, remain an experiment in progress, and in this litigation, charter schools are among those claiming that more money is necessary to provide an adequate system. Consolidation of school

---

[10] *Ante* at 50.

districts, on the other hand, seems to be an unpopular idea, but a few school districts have consolidated since this Court last noted the inefficiency created by a "multitude" of small school districts.[11]

The Legislature has also employed targeted grant programs to fund full-day prekindergarten. In a report to the Legislature, former Commissioner of Education Robert Scott recommended full funding for prekindergarten "early start" grants, describing it as a "critical" program that supports student progress from prekindergarten through the twelfth grade. Economically disadvantaged students may lag as much as eighteen months behind their peers when they enter kindergarten, but this gap can be cut in half with an effective prekindergarten program. In 2011, however, the Legislature eliminated grant funding in its entirety, cutting what at one time had been some $200 million per biennium in targeted grants for full-day prekindergarten. Some funding was restored in 2013, but the amount—$30 million per biennium—was only 15% of the pre-2011 level. Districts with a high level of need, but few financial resources, remain hampered in their ability to serve their disadvantaged students. Edgewood ISD presents a case in point: more than 90% of its students are economically disadvantaged, and the District lacks the $1.2 million necessary to serve the children on its prekindergarten waitlist. These children remain at risk of falling further and further behind.

### III

While there has been progress over the last twenty years, the need for more is apparent. A number of measures show a continuing gap between economically disadvantaged students and

---

[11] *Neeley*, 176 S.W.3d at 757; *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491, 497 (Tex. 1991).

students overall, including the four-year graduation statistics cited, in part, by the Court. Four-year graduation and dropout statistics track students who started together in the same ninth-grade cohort over four years to determine what percentage of those students graduate, drop out, or continue in school.[12] Four-year dropout rates, by definition, do not include students who dropped out before ninth grade.[13] As the Court notes, Texas had an overall four-year graduation rate of 88% in 2013; the corresponding dropout rate was 6.6%. In other words, 21,634 of twelfth-grade students who started ninth grade together, four years earlier, dropped out in 2013.[14] For economically disadvantaged students, the four-year graduation rate was lower, at 85.2%, while the dropout rate was higher, at 8.5%.[15] Thus, a disproportionate share of the students who dropped out, after failing to graduate in 2013, were poor. Economically disadvantaged students continued to lag behind in 2014, with four-year graduation and dropout rates remaining roughly the same.[16]

---

[12] DIVISION OF RESEARCH & ANALYSIS, TEX. EDUC. AGENCY, SECONDARY SCHOOL COMPLETION AND DROPOUTS IN TEXAS PUBLIC SCHOOLS 2012-13 at x (2014) (Doc. No. GE14 601 07) ("COMPLETION AND DROPOUTS 2012-13"), available as a PDF file from the agency's *Completion, Graduation, and Dropouts* webpage at http://tea.texas.gov/-acctres/dropcomp_index.html#reports.

[13] Dropouts are also counted annually. Of the 2,189,442 students who attended seventh through twelfth grades during the 2012–2013 school year, 31,509 students dropped out of the ninth through twelfth grades, and another 3,187 students dropped out of the seventh and eighth grades. *Id.* at xiv.

[14] *Grade 9 Longitudinal Graduation and Dropout Rates, Texas Public Schools, Class of 2013*, TEX. EDUC. AGENCY, https://rptsvr1.tea.texas.gov/acctres/completion/2013/state.html; *see also* COMPLETION AND DROPOUTS 2012-13 at xii.

[15] *Grade 9 Longitudinal Graduation and Dropout Rates by Race/Ethnicity and Gender, Texas Public Schools, Class of 2013*, TEX. EDUC. AGENCY, https://rptsvr1.tea.texas.gov/acctres/completion/2013/state_demo.html. Another 5.4% of economically disadvantaged students continued in school and another .9% received a GED. *Id.*

[16] *Compare Grade 9 Four-Year Longitudinal Graduation and Dropout Rates, Texas Public Schools, Class of 2014*, TEX. EDUC. AGENCY, https://rptsvr1.tea.texas.gov/acctres/completion/2014/state_4yr.html, *with Grade 9 Four-Year Longitudinal Graduation and Dropout Rates, by Race/Ethnicity, Economic Status, and Gender, Texas Public Schools, Class of 2014*, TEX. EDUC. AGENCY, https://rptsvr1.tea.texas.gov/acctres/completion/2014/state_demo_4yr.html.

In any event, graduation is only half the battle. Graduation in itself means little if it is not a meaningful hallmark for achievement. The State's current measure of achievement—STAAR test results—shows an ongoing achievement gap between students overall and economically disadvantaged students. In 2013, 71% of all fourth graders met the first "phase-in" STAAR level for reading proficiency, but only 63% of economically disadvantaged fourth graders fared as well.[17] In 2014, the corresponding numbers were 73% and 65%; in 2015, they were 71% and 62%.[18] Reading test results for other grades show similar performance divides. Annual "Report Cards" also show a disparity in the percentage of students who could meet what will be the "final" proficiency levels, once STAAR testing is fully "phased-in." In 2013, 34% of all students, for all subjects, could meet these "final" proficiency standards; only 25% of economically disadvantaged students could.[19] In 2014, the divide is 39% to 28%; in 2015, 38% to 27%.[20] The performance gap between all students and students who are economically disadvantaged persists, even as economically disadvantaged students grow to be a larger and larger percentage of the total student population.

A more pressing concern is the risk that performance gains achieved over the last decade are eroding. The Court notes, as a high point among otherwise lackluster NAEP test results, that average

---

[17] The "2012-13 Federal Report Card" can be found on the TEA's website, at https://rptsvr1.tea.texas.gov/-perfreport/frc/2013/srch.html.

[18] The "2014-15 Federal Report Card" can be found through the TEA's website at https://rptsvr1.tea.texas.gov/-perfreport/frc/2015/srch.html.

[19] *See* 2012-13 Federal Report Card.

[20] *See* 2014-15 Federal Report Card.

mathematics scores for all Texas eighth graders rose from 281 to 290 between 2005 to 2011.[21] That 2011 high point, however, was not repeated in succeeding years.[22] Average eighth-grade mathematics scores dropped to 288 in 2013 and to 284 in 2015. The NAEP comparison tool, in fact, shows no significant gain in average mathematics results for Texas eighth graders from 2005 to 2015.[23] Average mathematics scores for economically disadvantaged eighth graders also dropped—from 281 in 2011, to 279 in 2013, to 274 in 2015; on the bright side, the 2015 score still represents a ten-point gain over the average score from 2003. NAEP reading test results for eighth graders are more stable—if only because there have been no significant recent gains to lose.[24]

What may be far more interesting about the NAEP data is that it shows a much wider achievement disparity between students who are poor and those who are not. For mathematics scores, the gap between non-disadvantaged and disadvantaged eighth graders was 23 points in 2011, and 22 points in 2015, but scores dropped for both groups. The gap in reading scores—less stellar

---

[21] *Ante* at 63. The National Assessment of Educational Progress (NAEP) is a congressionally-mandated project administered by the National Center for Education Statistics (NCES), with the Department of Education and the Institute of Education Sciences. Reading and mathematics test results for fourth and eighth graders, as well as various tools for viewing a state's profile, intra-state score changes, and standing relative to other states, are available for 2015 and several earlier years at http://www.nationsreportcard.gov/.

[22] The NCES provides a "State Profiles" online tool that can be used to generate a state's test result history dating back to 1990, available at http://nces.ed.gov/nationsreportcard/states/. An interactive "State Comparison" tool can be used to generate tables, by year, grade, and test subject, to obtain more data about scores across several categories of students. *See* NAT'L CTR. FOR EDUC. STATISTICS, NAEP STATE COMPARISONS, http://nces.ed.gov/nationsreportcard/-statecomparisons.

[23] The "State Score Changes" comparison tool on the *Nation's Report Card* webpage can be used to compare fourth- and eighth-grade mathematics and reading scores from 2015 to results from past years ranging back to 1990.

[24] *See 2015 Mathematics and Reading Assessments; Reading; State Score Changes; State Score Change Map*, THE NATION'S REPORT CARD, an interactive tool available at http://www.nationsreportcard.gov/reading_math_2015/-#reading/state/scores?grade=8. The tool provides a link to toggle between fourth- and eighth-grade results.

all around—was 21 points in 2011 and 20 points in 2015.[25]

   If we chose to grade Texas in comparison to other states, we could definitely say Texas is not the worst.  In 2015, Texas placed 7th on math scores for economically disadvantaged eighth graders—significantly better than 26 states and the District of Columbia.  On reading scores for this group, however, Texas placed 37th—significantly better than only four states and the District of Columbia.  On results for all students in 2015, Texas ranked 23rd on math scores (significantly better than 19 states and DC) and 39th on reading scores (significantly better than only four states and DC).  It may be *enough*, for now, but we should aspire to more than being solidly in the middle.

---

[25] A table showing this data for each year, subject, and grade can be generated with the NCES comparison tool available at http://nces.ed.gov/nationsreportcard/statecomparisons.

## IV

Constitutionality is a minimum standard—a guarantee—not a cap on our expectations or our potential. Eleven years after our last school finance case, it still "remains to be seen whether the system's predicted drift toward constitutional inadequacy will be avoided by legislative reaction to widespread calls for change."[26] At the beginning of the day and in the end, only the Legislature can develop and implement new solutions, new efficiencies, and new ideas for funding public-school education. Our citizens must bear the consequences of those decisions, and I, for one, remain hopeful that more progress is yet to come.

_____

Eva M. Guzman
Justice

**Opinion issued**: May 13, 2016

---

[26] _Neeley_, 176 S.W.3d at 790.